IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KANEKA CORPORATION, § § *Plaintiff*, § § v. § § DESIGNS FOR HEALTH, INC., and § AMERICAN RIVER NUTRITION LLC, § § *Defendants*. § § | Civil Action No. 21-209-WCB |

## MEMORANDUM OPINION AND ORDER

Plaintiff Kaneka filed a motion to compel production of information responsive to its Third Set of Interrogatories and Fourth Supplemental Set of Requests for Production. Dkt. No. 315. Defendants Design for Health, Inc., ("DFH") and American River Nutrition LLC ("ARN") filed a motion to compel production of information responsive to their First Set of Interrogatories Related to Damages. Dkt. No. 319.

**I.    Kaneka's Motion**

Kaneka's Interrogatories and Requests for Production "seek information related to the creation of DTX 118 and Defendants' decision to omit information concerning their new formulation of ubiquinol products prior to production of DTX 118." Dkt. No. 315 at 1. DTX 118 is an exhibit that the defendants added to their trial exhibit list on April 30, 2024, described as "Updated CoQ10 Stability Data October 2023 through April 2024." Dkt. No. 190 at 1. On May 7, 2024, the defendants produced a copy of DTX 118 to Kaneka, which consisted of 230 pages of

1

documents.[1]  *Id*. at 2 n.2.  The first three pages of DTX 118 consisted of a PDF version of a spreadsheet containing testing results of ubiquinol ratios at ambient conditions for Lot 35550/35546 from October 16, 2023, to April 4, 2024.  *See* Dkt. No. 190-1, Exh. A at 2–4.  Kaneka filed a motion to exclude DTX 118 from the trial that was scheduled to begin on May 20, 2024, arguing that it was "untimely disclosed and its use at trial would substantially prejudice Kaneka."  Dkt. No. 190 at 5.

At a status conference held on May 16, 2024, the defendants represented that they had been selling a reformulated product as of "no later than October 1st" of 2023.  Dkt. No. 315-2, Exh. 2 at 13:1–2.  The defendants further represented that DTX 118 contained "three original pages of a spreadsheet, which showed that . . . all of the lots tested since October 1st every week had stayed under" the 90% threshold of ubiquinol ratio, so that those lots were found not to be infringing.  *Id*. at 15:6–8.  DTX 118 was thus intended to be offered as evidence to cut off Kaneka's damages as of the time the reformulated versions of the defendants' products were substituted for the preceding versions.  *See id*. at 23:15–22.

Because of the late production of DTX 118, the court bifurcated the trial to proceed first on liability for the defendants' original formulation, and then on "the question of a) whether the new product actually does or doesn't infringe, and b) what the consequences for damages might be, if in fact the new product does not infringe but the old product does."  *Id*. at 25:11–14.

On April 8, 2025, Kaneka represented in a letter to the court that "[o]n March 27, 2025, Defendants produced—for the first time—a native excel spreadsheet . . . which contained the very data that Defendants had previously produced as DTX 118."  Dkt. No. 302 at 3.  The native excel

---

[1] The defendants produced the first three pages of DTX 118 on May 6, 2024, and then re-produced DTX 118 as a 230-page document the next day.  *See* Dkt. No. 190 2 n.2.

spreadsheet contains additional testing results not found in the original production of DTX 118—additional weeks of testing of Lot 35550/35546 at ambient conditions (up to May 2, 2024), as well as testing of the same lot under accelerated conditions from October 11, 2023, to May 2, 2024. *Compare* Dkt. No. 302-1, Exh.1 *with* Dkt. No. 302-2, Exh. 2.  Under accelerated conditions, ubiquinol ratios exceeded 90% in some of the weekly testing. *See* Dkt. No. 302-2, Exh. 2. Kaneka represented that "[t]he metadata on the spreadsheet shows that it was created by a lab manager at DFH and was last modified on May 6, 2024." Dkt. No. 302 at 3.

Following the defendants' production of the native excel spreadsheet from which DTX 118 was taken ("the native spreadsheet"), Kaneka served interrogatories and requests for production "to obtain information about, among other things, how Defendants tested their reformulated product, how DTX 118 was created and produced, and who was involved in these decisions." Dkt. No. 315 at 1.  In response to Interrogatory No. 25 addressed to that issue, the defendants responded that "DTX 118 does not exist in Defendants' technical files and does not appear to be a document maintained in the normal course of Defendants' business," and that "Defendants' personnel were not involved in the creation of DTX 118, nor are Defendants aware of any of their personnel reviewing DTX 118, or otherwise being aware of DTX 118, prior to it being provided to Plaintiff's counsel on May 6, 2024." Dkt. No. 315-5, Exh. 5 at 21.  The defendants made similar assertions in response to other interrogatories directed to DTX 118. *See id*. at 12, 13, 14, 20.

The defendants also asserted the attorney-client privilege and work-product protection in response to Kaneka's requests for production of documents, and they produced a privilege log listing approximately 260 documents.  Dkt. No. 315-6, Exh. 6; Dkt. No. 328 (the defendants' privilege log).  Most of the documents on the privilege log consist of email correspondence (and attachments to those emails).  However, fifteen of the documents are listed as "[c]onfidential

3

testing results performed at the direction of counsel for the purposes of evaluating litigation strategy," each of which is dated March 13, 2025.  *See* Dkt. No. 328 at 15–16.

Following the production of the privilege log, Kaneka filed a motion to compel, arguing that the defendants' responses to its discovery requests have been inadequate and unresponsive. Kaneka argued that the crime-fraud exception applies to the defendants' assertion of attorney-client privilege and that as to the testing results, "[p]rivilege does not cover 'purely scientific data.'"  Dkt. No. 315 at 3–4.  The court then ordered the defendants to produce the documents identified in the privilege log for *in camera* review.  Dkt. No. 316.  The defendants subsequently filed their own motion to compel, seeking an order directing Kaneka to respond more fully to the defendants' interrogatories.  A hearing was held on May 5, 2025.  This order summarizes the rulings made in the course of that hearing.

### A.  Work Product Protection

The defendants have asserted both attorney-client privilege and work-product protection for most of the items listed on their privilege log.  The items for which the defendants have asserted only work-product protection are the fifteen testing results dated March 13, 2025.  *See* Dkt. No. 328 at 15–16.  I first address whether those testing results are entitled to work-product protection.

The work-product doctrine protects from discovery "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)."  Fed. R. Civ. P. 26(b)(3)(A).  That protection covers factual materials.  *Martin v. Bally's Park Place Hotel & Casino*, 983 F.2d 1252, 1261 (3d Cir. 1993) ("This definition [of attorney work product under Federal Rule 26(b)(3)] encompasses factual materials.").

Numerous courts have held that the results of testing performed at the request of counsel in anticipation of a litigation, including patent infringement litigation, are protected as work product. *See, e.g., Phillips Elecs. N. Am. Corp. v. Universal Elecs. Inc.*, 892 F. Supp. 108, 110 (D. Del. 1995); *Graham Packaging Co. v. Ring Container Techs., LLC*, No. 3:23-CV-110, 2024 WL 1221178, at *4 (W.D. Ky. Mar. 21, 2024); *Swoboda v. Manders*, No. 14-19, 2016 WL 2930962, at *7 (M.D. La. May 19, 2016); *Innovative Sonic Ltd., Rsch. In Motion, Ltd.*, No. 3:11-CV-706, 2013 WL 775349, at *2 (N.D. Tex. Mar. 1, 2013) (collecting cases). The fifteen testing results from March 13, 2025, are no different.[2]

Work-product protection, however, can be waived by the disclosure of certain protected material to an adversary. *See In re Chevron Corp.*, 633 F.3d 153, 165 (3d Cir. 2011); *United States v. Sanmina Corp.*, 968 F.3d 1107, 1109–20 (9th Cir. 2020). In this case, the defendants waived work-product protection for DTX 118 and the associated native spreadsheet[3] by producing those documents. The question is whether that waiver affects the protected status of any other documents created pursuant to the directions of counsel during the period between October 2023 and May 2024, or later.

---

[2] In asserting that the testing results must be produced, Kaneka quotes *Pfizer Inc. v. Ranbaxy Laboratories Ltd.*, No. 3-209, 2004 WL 2323135, at *1 (D. Del. Oct. 7, 2004), as holding that "[f]actual information, technical data, the results of studies, investigations and testing to be used at trial, and other factual information is discoverable." *See* Dkt. No. 315 at 4. That statement in *Pfizer*, however, was made in the context of explaining that the "attorney client privilege attaches to the communication itself and not to the facts communicated." 2004 WL 2323135 at *1. The defendants have asserted work product protection, not the attorney-client privilege, with respect to the testing results at issue in this case and, as noted, work product protection extends to factual information developed at the direction of the attorney. Moreover, *Pfizer* goes on to explain that "[d]ocuments sent or prepared by counsel containing such factual information for the purpose of obtaining or giving legal advice are protected from disclosure." *Id*.

[3] The defendants represented at the hearing that the testing underlying DTX 118 and the native spreadsheet was performed at the direction of counsel for purposes of the ongoing litigation. The defendants further clarified that the testing underlying DTX 118 and the native spreadsheet were performed by Sarah Gannon, an in-house chemist at DFH.

5

The scope of the waiver of both attorney-client privilege and work-product protection is governed by Federal Rule of Evidence 502(a), which provides that "the waiver extends to an undisclosed communication or information . . . only if: (1) the waiver is intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; and (3) they ought in fairness to be considered together." [4] The advisory committee note to Rule 502 states that a "subject matter waiver," *i.e.*, waiver of more than the communication or information disclosed, "is reserved for those unusual situations in which fairness requires a further disclosure of related, protected information, in order to prevent a selective and misleading presentation of evidence to the disadvantage of the adversary."

Courts have explained that waiver may be extended to undisclosed material to prevent or remedy disclosures that are "incomplete, manipulative, or misleading." *Fin. Guaranty Ins. Co. v. Putnam Advisory Co.*, 314 F.R.D. 85, 91 (S.D.N.Y. 2016); *see also Thorn Emi N. Am., Inc. v. Micron Tech., Inc.*, 837 F. Supp. 616, 621 (D. Del. 1993) ("[C]ourts generally find waiver only if facts relevant to a particular, narrow subject matter are at issue and have been disclosed under circumstances where it would be unfair to deny the other party an opportunity to discover other facts relevant to that subject matter."); *Bovis Lend Lease, LMB, Inc. v. Seasons Contracting Corp.*, No. Civ. 9212, 2002 WL 31729693, at *5 (S.D.N.Y. Dec. 5, 2002) ("[W]here a party selectively discloses certain privileged or work product material, but withholds similar (potentially less favorable) material, principles of fairness may require a more complete disclosure.").

---

[4] "[W]ork-product waiver extends only to 'factual' or 'non-opinion' work product concerning the same subject matter as the disclosed work product." *In re EchoStar Comm'cns Corp.*, 448 F.3d 1294, 1302 (Fed. Cir. 2006); *see also* Fed. R. Civ. P. 26(b)(3)(B) ("If the court orders discovery of those materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation."). The fifteen testing results from March 15, 2025, are clearly factual work products.

At the same time, courts are mindful that when subject matter is defined too broadly, "any waiver of work product would effectively reach all of a lawyer's work in a case and would not be a 'subject matter' waiver." *E.I. Dupont de Nemours & Co. v. Kolon Indus., Inc.*, 269 F.R.D. 600, 607 (E.D. Va., 2010). Courts must thus "balance the policies to prevent sword-and-shield litigation tactics with the policy to protect work product." *In re EchoStar Comm'cns Corp.*, 448 F.3d at 1302.

In *Lone Star Technological Innovations, LLC v. ASUSTeK Computer Inc.*, No. 6:19-CV-59, 2020 WL 6803252 (E.D. Tex. Apr. 28, 2020), the defendant produced the results of a test purporting to show non-infringement of an asserted patent. The results of the test would otherwise have qualified as protected work product. The plaintiff argued that the defendant should be required to produce "any non-infringement work product, as well as communications from [the defendant's] counsel to the company related to this non-infringement testing." *Id*. at *3. The court held that the plaintiff was "entitled to work product necessary to test the validity and implications of [the defendant's] non-infringement testing in ASUSLS000001," because "[i]f the testing is flawed, biased or otherwise limited, its results may be called into question." *Id*. at *4. The court included in the scope of the waiver "any attorney work product that directed [the defendant's] employees on how to design, develop or implement that non-infringement testing," as well as "any work product related to alternative testing protocols that were rejected while developing ASUSLS000001's protocol." *Id*. at *5. The court, however, declined to impose "a broad waiver [that] would include attorneys' opinions about whether the testing was valid and what the results implicated." *Id*. at *4.

In this case, I conclude that Kaneka is entitled to disclosure of any of the defendants' work product necessary to evaluate whether the testing results contained in the native spreadsheet (from

7

which DTX 118 was taken) are "flawed, biased or otherwise limited" such that "its results may be called into question." That would include, if it existed, the results of any other stability testing performed on the defendants' reformulated products in the period from October 2023 to May 2024. Further stability testing performed in the same period could call into question the validity and reliability of the results that the defendants reported in the native spreadsheet. However, the defendants represented at the hearing that during the period at issue, they did not conduct any stability testing of their reformulated products beyond what had already been disclosed in the native spreadsheet and documentation related to DTX 118.[5]

Importantly, the waiver is not so broad as to include any testing of the defendants' products done at any time outside the period of October 2023 to May 2024. Defining the subject matter of waiver as *all* testing the defendants have ever performed on their reformulated product is not sufficiently tied to the substance of the disclosed material, which is the testing performed in the limited time period between October 11, 2023, and May 2, 2024. Thus, for example, the fifteen testing results from March 13, 2025, do not fall within the scope of the waiver because they have minimal bearing on the validity or reliability of the testing from a year earlier on a different lot of the accused product. Without waiver extending to the testing results from March 15, 2025, and absent waiver resulting from partial disclosure, Kaneka can overcome the work-product protection applicable to the defendants' testing only by showing that Kaneka "has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(ii).

---

[5] The defendants further represented that any testing performed prior to October 2023 was not of the final version of the reformulated products that went on sale from October 2023. The results of stability testing on anything other than the final version of the defendants' reformulated products are not a part of the scope of the waiver at issue.

Kaneka has not made such a showing. In January 2025, the defendants produced three bottles of their reformulated products that were sold after September 30, 2023, to Kaneka for testing. Dkt. No. 277 at 2. Thus, as of March 2025, Kaneka was able to conduct its own tests of the defendants' reformulated products. Indeed, even without the defendants' production of those samples, Kaneka could have simply obtained and tested off-the-shelf samples of the defendants' reformulated products that were made available to the public as of late 2023.

Accordingly, Kaneka's motion to compel is denied as it relates to the testing results from March 13, 2025, and any other testing done by the defendants outside the period between October 2023 and May 2024.

### B. Attorney-Client Privilege

The defendants have asserted attorney-client privilege with respect to every item on the privilege log, other than the testing results discussed above. Kaneka does not dispute that those communications are *prima facie* privileged. Rather, it argues that the crime-fraud exception to the attorney-client privilege applies to those materials and requires that they be disclosed.

"To circumvent the attorney-client privilege under the crime-fraud exception, the party seeking to overcome the privilege . . . must make a *prima facie* showing that (1) the client was committing or intending to commit a fraud or crime, and (2) the attorney-client communications were in furtherance of that alleged crime or fraud." *In re Grand Jury Subpoena*, 745 F.3d 681, 687 (3d Cir. 2014) (cleaned up). "Because it is often difficult or impossible to prove that the exception applies without delving into the communications themselves, the Supreme Court has held that courts may use *in camera* review to establish the applicability of the exception." *Id*. Based on my *in camera* review of the privileged communications, I find that Kaneka has not shown

that the crime-fraud exception applies to the production of materials that Kaneka has requested from the defendants in this case.

Kaneka argues that "[e]vidence of spoliation triggers the crime-fraud exception," citing *IQVIA, Inc. v. Veeva Sys., Inc.*, No. 2:17-CV-177, 2021 WL 12319551 (D.N.J. May 7, 2021). Dkt. No. 315 at 4. Kaneka further argues that "there is sufficient *prima facie* evidence that Defendants intended to commit a fraud by spoliating evidence," pointing to the discrepancies between DTX 118 and the native spreadsheet. *Id*. Kaneka's argument on spoliation, however, is undermined by the fact that the defendants produced the native spreadsheet to Kaneka ahead of the second phase of the trial.[6]

Even assuming that Kaneka has made a *prima facie* showing of the facts necessary to trigger the crime-fraud exception to the attorney-client privilege, the defendants have provided a plausible explanation for the discrepancies between DTX 118 and the native spreadsheet that rebuts the *prima facie* case. *See* 2021 WL 1319551, at *9 ("If the court accepts the explanation provided by the party asserting the privilege as sufficient to rebut the *prima facie* case made at stage one, the privilege will be upheld.").

The defendants assert that "[t]heoretical testing performed under accelerated conditions was not relevant because those conditions are different from the product's standard storage conditions, and therefore not representative of the reformulated product." Dkt. No. 327 at 4. That

---

[6] In *IQVIA*, the court held that the plaintiff had made a *prima facie* showing sufficient to trigger the crime-fraud exception based on a spreadsheet (referred to as the "DataDestroyed Spreadsheet") that "identifies documents and/or information in existence at the time of its creation, along with notations concerning whether those documents and/or information were deleted or needed to be deleted." 2021 WL 12319551, at *10 ("As this document was created *after* litigation commenced, and it is identifying documents or information that were "FOUND" at that point in time, the fact that a column contains references to the documents being "PURGED" would suggest that these documents were deleted *post-litigation*.") (emphasis in original). No such evidence of the intent to spoliate was found during the *in camera* review in this case.

explanation weighs against finding that the initial omission of testing results for accelerated conditions rises to the level of fraud. Of the materials ultimately disclosed from the testing that gave rise to DX 118, only the results of the testing that was conducted under accelerated conditions showed ubiquinol ratios above 90%; the results shown in the native spreadsheet for the four additional weeks of testing under ambient conditions did not show any ubiquinol ratios exceeding 90%. *See* Dkt. No. 302-2, Exh. 2. While that explanation by the defendants is not a sufficient ground on which to assert that there has been no waiver of the work-product protection, it is a sufficient basis for concluding that the defendants and their attorneys have not engaged in improper conduct sufficient to trigger the crime-fraud exception to the attorney-client privilege. Moreover, without disclosing the contents of any of the materials provided to me by the defendants for *in camera* review, I can affirm that none of those materials provided a basis for reaching a different conclusion.

Accordingly, Kaneka's motion to compel is denied on all communications for which the defendants have asserted attorney-client privilege.

## II.     The Defendants' Motion

On April 25, 2025, the defendants filed a motion to compel Kaneka "to respond to Defendants' Damages Interrogatories fully, consistent with its representations during the parties' April 7 meet and confer." Dkt. No. 319 at 2. The defendants asserted that, as of the date of filing their motion, Kaneka failed to provide the following information as it had represented it would: (1) identification of "all" persons involved in preparing the calculations in PTX 116 and PTX 117, alongside "all" documents constituting the source material for PTX 116 and 117 (Interrogatory Nos. 1–2); (2) identification of any "new" damages that Kaneka is seeking (Interrogatory No. 7); (3) identification of the organizational structure of Kaneka (Interrogatory Nos. 8–10); (4) possible

identification of Dr. Iwao Funahashi as someone with knowledge about Kaneka's dividend policy and Kaneka's inexorable flow theory of damages (Interrogatory Nos. 11–12). PTX 116 and 117 are Kaneka's "charts showing how [Kaneka North America LLC's] profits inexorably flow to Kaneka pursuant to Kaneka's dividend policy." Dkt. No. 325 at 1.

Kaneka filed a response to the defendants' motion on April 28, 2025. Kaneka represents that as of that day, it had supplemented: (1) its response to Interrogatory No. 7 by identifying its new damages theories; (2) its response to Interrogatory Nos. 8–10 by producing organizational charts; and (3) its response to Interrogatory Nos. 11–12 by identifying Dr. Funahashi as a knowledgeable person and producing him for deposition. Dkt. No. 325 at 2–3. As for its response to Interrogatory Nos. 1–2, Kaneka asserts that the defendants' demands for identification of "all" persons and "all" documents are unreasonable and not proportional to their needs, particularly in light of what Kaneka produced even before the meet and confer. That is, Kaneka had identified Ronald Martin and Sam Rosenfarb as persons most knowledge able about PTX 116 and 117, and had produced multiple categories of financial statements and accounting worksheets that formed the basis of the calculations in PTX 116 and 117. *See id*. at 1–2. According to Kaneka, the defendants have not responded to their request to identify the "types of documents they believe they need in addition to those produced." *Id*. at 2.

It appears that Kaneka has addressed most, if not all, of the deficiencies that the defendants identified in their motion to compel. As for Kaneka's response to Interrogatory Nos. 1–2, I agree that it would be unreasonable for Kaneka to be required to list every person involved in any way in the creation of PTX 116 and PTX 117, particularly in light of Kaneka's identification of Dr. Funahashi as someone knowledgeable about Kaneka's dividend policy and inexorable flow theory of damages, which is the subject of PTX 116 and PTX 117.

At the hearing that the court held on May 5, 2025, the court asked the defendants to identify any remaining inadequacies in Kaneka's production of documents or responses to interrogatories. The defendants raised issues relating to the deposition of Mr. Martin as a Rule 30(b)(6) witness on May 2, 2025, which went beyond the scope of their letter to the court and had not yet been the subject of a meet-and-confer among the parties. To the extent that the asserted deficiencies identified in the defendants' letter have been addressed, the defendants' motion is denied as moot.

In an abundance of caution, this order has been filed under seal because the parties' briefs and exhibits regarding the present motion were filed under seal. Within three business days of the issuance of this order, the parties are directed to advise the court by letter whether they wish any portions of the order to remain under seal. Any request that portions of the order should remain under seal must be supported by a particularized showing of need to limit public access to those portions of the order.

IT IS SO ORDERED.

SIGNED this 7th day of May, 2025.

_____
WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE